No. 22-55254

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

**PERSIAN BROADCAST SERVICE GLOBAL, INC.**,
*Plaintiff-Appellant,*

v.

**MARTIN J. WALSH, Secretary of Labor**;
**U.S. DEPARTMENT OF LABOR,**
*Defendants-Appellees.*

Appeal from the United States District Court,
Central District of California, No. 2:21-cv-00229-CAS-GJS

---

**APPELLEES' ANSWERING BRIEF**

---

E. MARTIN ESTRADA
*United States Attorney*
DAVID M. HARRIS
*Assistant United States Attorney*
*Chief, Civil Division*
MATTHEW J. SMOCK
*Assistant United States Attorney*
Federal Building
300 N. Los Angeles Street, Suite 7516
Los Angeles, California 90012
Telephone: (213) 894-0397
E-mail: matthew.smock@usdoj.gov

Attorneys for Defendants-Appellees
Martin J. Walsh, Secretary of Labor and
U.S. Department of Labor

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   COUNTER-STATEMENT OF THE ISSUES ................................. 3

III.  STATEMENT OF JURISDICTION ................................................ 4

IV.   STATEMENT OF THE CASE ......................................................... 5

  A.    Statutory and Regulatory Background .................................. 5

  B.    Factual Background ................................................................. 8

  C.    Procedural History .................................................................. 13

    1.    Administrative Proceedings .......................................... 13

    2.    District Court Proceedings ........................................... 15

V.    STANDARD OF REVIEW ................................................................ 16

VI.   SUMMARY OF THE ARGUMENT ................................................... 17

VII.  ARGUMENT ................................................................................... 21

  A.    This Court Should Affirm the District Court's
        Summary Judgment Decision on Persian's APA Claim ....... 21

    1.    Persian Does Not Dispute that it Failed to Pay
          Varess the Required Wage Under Either LCA or
          that the First LCA Was Enforceable ........................... 21

    2.    The District Court Appropriately Declined to
          Disturb the ARB's Reasonable Conclusion that
          the Expiration of Varess's E-3 Visa Did Not End
          Persian's Requirement to Pay the Required Wage ..... 23

      a.    A Visa is a Travel Document, While an LCA
            is an Employment Document ............................... 23

      b.    Varess Received Authorization to Stay in
            the United States Until September 2015 ........... 25

i

c.   Persian's Position is Inconsistent with the Breadth of the LCA Wage Requirement and the Limited Exceptions to that Requirement .....27

d.   The ARB's Decision in *Manoharan* Is Distinguishable Because It Involved an H-1B Worker, not an E-3 Worker ...........................31

e.   Persian Was Responsible to Pay Varess the Required Wage for the Duration of the Second LCA, and Varess's Administrative Complaint Was Therefore Timely ......................37

3.   The District Court's Decision Is Consistent with the Policy of the E-3 Statute and Regulations ...........39

B.   The Court Should Affirm the District Court's Grant of Summary Judgment on DOL's Counterclaim ......................42

VIII. CONCLUSION ................................................................. 43

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Burrell v. McIlroy,*
464 F.3d 853 (9th Cir. 2006) .................................................................. 16

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
631 F.3d 1072 (9th Cir. 2011) ............................................................... 17

*Family Inc. v. USCIS,*
469 F.3d 1313 (9th Cir. 2006) ............................................................... 17

*Gordon v. Virtumundo, Inc.,*
575 F.3d 1040 (9th Cir. 2009) ............................................................... 16

*Judulang v. Holder,*
565 U.S. 42 (2011) .................................................................................. 16

*Martinez–Serrano v. INS,*
94 F.3d 1256 (9th Cir. 1996) ................................................................. 31

*Nance v. EPA,*
645 F.2d 701 (9th Cir. 1981) ................................................................. 17

*Smith v. Marsh,*
194 F.3d 1045 (9th Cir. 1999) ............................................................... 42

*Syed v. M-1, LLC,*
853 F.3d 492 (9th Cir. 2017) ................................................................. 31

*Tkacz v. Bogden,*
No. 18-15771, 788 F. App'x 528 (9th Cir. Dec. 19, 2019) .................... 17

*Turtle Island Restoration Network v. U.S. Dep't of Commerce,*
878 F.3d 725 (9th Cir. 2017) ................................................................. 16

## Statutes

5 U.S.C. § 702 ....................................................................... 4
5 U.S.C. § 706 ..................................................................... 16
8 U.S.C. § 1182 .................................................... 5, 6, 7, 27
8 U.S.C. § 1184 ............................................................ 33, 35
28 U.S.C. § 1291 ................................................................... 4
28 U.S.C. § 1331 ................................................................... 4
28 U.S.C. § 1346 ................................................................... 4
Pub. L. No. 108-78 ............................................................ 33
Pub. L. No. 108-77 ............................................................ 33
Pub. L. No. 109-13 ............................................................ 33

## Rules

Fed. R. App. P. 4(a)(1)(B) .................................................. 4

## Regulations

8 C.F.R. § 214.1 ................................................................. 35
8 C.F.R. § 274a.12 ............................................................. 33
20 C.F.R. § 655.700 ................................................. 5, 6, 33, 34
20 C.F.R. § 655.705 ....................................................... 5, 33
20 C.F.R. § 655.730 ........................................................... 25
20 C.F.R. § 655.731 .............................. 21, 22, 23, 27, 36
20 C.F.R. § 655.750 ..................................................... 25, 28
20 C.F.R. § 655.800 ............................................................. 7
20 C.F.R. § 655.806 ..................................................... 37, 38
22 C.F.R. § 41.112 ................................................... 6, 24, 26
22 C.F.R. § 41.51 ................................................................. 5
70 Fed. Reg. 52,292 (Sept. 2, 2005) ............................... 6, 7
72 Fed. Reg. 1650 (Jan. 12, 2007) ...................................... 5
72 Fed. Reg. 1651 (Jan. 12, 2007) .................................. 5, 33
85 Fed. Reg. 13,186, 13,187–88 (Mar. 6, 2020) ............... 8, 15

## I.    INTRODUCTION

This case involves an employer's blatant failure to pay a nonimmigrant worker his required compensation and its subsequent attempts to evade responsibility. Beginning in 2011, Plaintiff-Appellant Persian Broadcast Service Global (Persian), a Farsi-language television station, employed Majid Varess, an Australian nonimmigrant worker subject to the E-3 visa program, as a sports producer and reporter. Persian was required by statute and regulation to file and comply with a Labor Condition Application (LCA), including a requirement to pay Varess the greater of the prevailing or actual wage, which Persian attested was $45,000 per year. Two years later, Persian filed and obtained approval for a second LCA to extend Varess's employment until late 2015 at a required wage of $60,000 annually.

Despite its promises and legal obligations, Persian completely failed to compensate Varess as required, paying him only about $20,000 during his entire employment. Following lengthy administrative proceedings, the Department of Labor's (DOL) Administrative Review Board (ARB) concluded that Persian violated its LCAs and the underlying statutory and regulatory wage requirements, and ordered it

to pay Varess $183,794, plus interest, for its egregious violations. The district court rejected Persian's challenge to the ARB's decision under the Administrative Procedure Act (APA) and entered judgment on the counterclaim for enforcement of the decision by Defendants-Appellees DOL and the Secretary of Labor.

On appeal, as in the district court and in the administrative proceedings, Persian does not contend that it paid Varess in accordance with its LCAs. Rather, it argues that Varess has no remedy for Persian's violations because Varess's E-3 visa expired in September 2013, which Persian contends ended its wage obligation, rendered its second LCA unenforceable, and caused Varess's administrative complaint to DOL, filed in February 2015, to be barred by the one-year statute of limitations.

This Court should reject Persian's arguments and affirm the district court. Persian's argument that Varess's visa expiration relieved it of any further wage obligations to him is unfounded. Rather, as the district court concluded, the ARB reasonably interpreted the relevant statutory and regulatory provisions in finding that the approval periods of Persian's LCAs, which ran from September 2011 to September 2015,

defined the temporal scope of Persian's requirement to pay Varess the required wage, and that neither Varess's visa expiration nor his eventual departure from the United States terminated this requirement. This Court should accordingly affirm the decision below requiring Persian to pay Varess the back wages and interest that he has been owed for the better part of a decade.

## II.    COUNTER-STATEMENT OF THE ISSUES

1.    Did the district court correctly conclude that the ARB's decision awarding Varess $183,794 in back wages, plus interest, was reasonable and not arbitrary, capricious, contrary to law, or unsupported by substantial evidence, where Persian does not dispute that it failed to pay Varess the required wage under either LCA or that the first LCA was enforceable; where Persian's wage obligation to Varess continued for the duration of both of its LCAs because the expiration of Varess's visa did not terminate his period of authorized employment; and where the decision was consistent with the policy of the E-3 statute and regulations because Persian's nonpayment of Varess's wages was the type of treatment that the LCA requirements were enacted to prevent?

2.     Should this Court affirm the district court's judgment upholding the ARB's order under the APA, did the district court correctly order Persian to pay the back wages and interest owed, where Persian advanced no arguments to the contrary before the district court and where its only argument in this Court rests on purported equitable grounds unsupported by either legal authority or evidence?

## III.  STATEMENT OF JURISDICTION

The statutory bases for jurisdiction in the district court were 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 5 U.S.C. § 702. The statutory basis for jurisdiction in this Court is 28 U.S.C. § 1291.

On March 2, 2022, following its order granting Defendants' motion for summary judgment and denying Persian's cross motion for summary judgment, the district court entered its final judgment. ER-92.[1] Persian filed its Notice of Appeal on March 7, 2022. ER-85–92. Thus, the appeal is timely. Fed. R. App. P. 4(a)(1)(B).

---

[1] This brief uses ER to refer to Appellant's Excerpts of Record, SER to refer to Appellees' Supplemental Excerpts of Record, AOB to refer to Appellant's Opening Brief, and CR to refer to the docket number in the district court record, used only for undisputed background information provided only for general context. *See* Advisory Committee Note to Circuit Rule 30-1.1.

## IV. STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

The E-3 visa program of the Immigration and Nationality Act (INA) allows Australian nationals to work in the United States temporarily in "specialty occupation[s]." 8 U.S.C. § 1101(a)(15)(E)(iii). To employ an E-3 worker, the employer must first file an LCA with DOL stating its intention to employ a nonimmigrant worker in a particular occupation. 8 U.S.C. § 1182(t); 20 C.F.R. § 655.700.[2] After DOL certifies an LCA, a nonimmigrant who is not already in the United States must apply to the Department of State for a visa, which, if granted, allows the nonimmigrant to travel to the United States during a two-year period. 20 C.F.R. §§ 655.705(b), 655.750(a); 22 C.F.R. § 41.51(c); U.S. Dep't of State, Foreign Affairs Manual ("FAM"), 9 FAM 402.9-8(L)(a);[3] 72 Fed. Reg. 1650, 1651 (Jan. 12, 2007). Upon entry, a nonimmigrant is issued a Form I-94 by the Department of Homeland Security's (DHS) Customs and Border Protection (CBP) that specifies

---

[2] 8 U.S.C. § 1182 contains two paragraph (t)'s. The provisions regarding E-3 employment are in the first § 1182(t).

[3] *See* https://fam.state.gov/FAM/09FAM/09FAM040209.html#M402_9_8_L.

the length of the nonimmigrant's authorized stay in the United States. *See* 22 C.F.R. § 41.112(a).

The requirements and enforcement mechanisms for the E-3 program are similar to those for the H-1B visa program, which applies to temporary foreign workers in specialty occupations generally. *See* 20 C.F.R. § 655.700(d)(2); *see generally* 8 U.S.C. § 1182(n). As a result, most—but not all—of the statutory and regulatory requirements applicable to employers of H-1B employers also apply to employers of E-3 workers, including the wage requirement. 20 C.F.R. § 655.700(d)(2). One important distinction is that for an H-1B worker, after DOL certifies the LCA, the employer must also file, and receive approval of, a petition with the DHS's United States Citizenship and Immigration Services (USCIS). 20 C.F.R. § 655.700(b)(2). The petition requirement is inapplicable to E-3 workers. *Id.* § 655.700(d)(1); 70 Fed. Reg. 52,292, 52,292 (Sept. 2, 2005); 72 Fed. Reg. at 1651.

The LCA contains certain binding attestations, one of which is that during the "period of authorized employment," the employer must pay a required wage, which is the higher of (1) "the actual wage level paid by the employer to all other individuals with similar experience

and qualifications for the specific employment in question," or (2) "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(t)(1)(A)(i). E-3 employees generally must be paid the required wage even when they are in nonproductive status, including because of lack of assigned work, lack of a permit or license, or any other reason, unless the nonproductive status is due to non-work-related factors that take the nonimmigrant away from work for the worker's convenience, *e.g.*, vacation, or render the nonimmigrant unable to work, *e.g.*, maternity leave. *Id.* § 1182(t)(3)(C)(vii)(I)–(II), (IV); 20 C.F.R. § 655.731(c)(7)(i)–(ii). The employer need not pay the required wage if there has been a *bona fide* termination of the employment relationship. *Id.* § 655.731(c)(7)(ii).

Congress delegated to DOL the authority to enforce the labor requirements of the E-3 visa program through administrative investigations and adjudications. 8 U.S.C. § 1182(t)(3); 20 C.F.R. Part 655, Subpart I. In most cases, an investigation begins when an aggrieved party files a complaint with DOL's Wage and Hour Division (WHD). *See* 20 C.F.R. §§ 655.800(a); 655.806(a). After WHD investigates the complaint, it issues a letter with its determination and

any remedies, including the payment of any back wages due. *Id.* §§
655.806(a)(3), (b); 655.810(a), 655.815. WHD's determinations can be
challenged in a hearing before an administrative law judge (ALJ), *id.*
§ 655.820, and the ALJ's decision may be appealed to the ARB, *id.*
§ 655.845. While the Secretary of Labor has discretion to review ARB
decisions, the ARB's orders become final DOL orders if the Secretary
does not exercise this authority within prescribed time limits. *See*
Secretary's Order 01-2020, 85 Fed. Reg. 13,186, 13,187–88 (Mar. 6,
2020).

## B. Factual Background

Persian, a California corporation, operates Pars TV, a Farsi-
language television station. SER-13 ¶ 1, 118–19.[4] Its president and
chief operating officer is Amir Shadjareh. SER-13 ¶ 2, 118, 121. Varess

---

[4] Persian's Excerpts and Appellees' Supplemental Excerpts both
include portions of the Certified Administrative Record (CAR) before
DOL, the entirety of which was filed in the district court as CR-22.
Pursuant to the local rules of the Central District of California, both
parties also filed statements of fact with citations to the CAR in support
of their summary judgment motions. *See* ER-22–44. Persian failed to
file any response to Defendants' Statement of Uncontroverted Facts
before the district court. *See* SER-5–6 (Persian's opposition to
Defendants' summary judgment motion). Accordingly, the facts in
Defendants' statement may be deemed admitted. *See* United States
District Court for the Central District of California, Local Rule 56-3.

is an Australian national of Iranian origin who has worked since 1974 as a sports producer and reporter. SER-13 ¶ 3, 57–58, 77.

In 2011, at the age of 61, Varess came to the United States to work for Persian on an E-3 visa. SER-13 ¶ 5, 75. Varess relocated at significant financial and personal cost, including airfare, rent payments in Australia and the United States, furniture, appliances, and other expenses in the United States, and time away from his family in Australia. SER-76–77, 83–84. Despite these drawbacks and his own health problems, he viewed the position as a unique late-career opportunity to broadcast sports worldwide in Farsi for a station that shared his opposition to the Iranian regime. SER-75–76, 85.

To employ Varess, Persian filed an LCA with DOL in September 2011. SER-13 ¶ 4, 42–47. The LCA indicated that Persian would be employing a "TV producer and reporter," that the prevailing wage rate for this position was $44,013 per year, and that Varess would be paid $45,000 per year. SER-43, 45. DOL approved the LCA for a period from September 12, 2011 to September 12, 2013. SER-13 ¶ 4, 47. Varess then obtained an E-3 visa with an expiration date of September 12, 2013,

entered the United States on November 23, 2011, and began working for Persian. SER-13 ¶ 5, 54.

During Varess's employment with Persian, he hosted and produced sports programs. SER-13 ¶ 5, 57. Varess estimated that he worked between 60 and 70 hours per week. SER-110–11. Varess worked both in the United States and from other locations around the world, and thus left the United States and returned several times. SER-13–14 ¶¶ 6–12, 93. For example, he reported from England during the Wimbledon tennis tournament, reported on soccer matches from England and Ireland, and also reported from Belgium, France, and Australia. SER-93–94, 103–04. He hoped to broadcast the 2014 World Cup soccer tournament, in which Iran participated, from Brazil. SER-100, 106–09. Varess could perform his duties overseas because he uploaded his shows using the internet and Persian broadcasted them via satellite. SER-93–94, 104–05, 110. Shadjareh supported these efforts to broadcast overseas. SER-110.

In August 2013, Persian filed a second LCA to continue Varess's employment. SER-14 ¶ 11, 48–53. That LCA listed the prevailing wage rate as $59,384 and stated that Varess would be paid an annual salary

of $60,000. SER-51. On August 30, 2013, DOL approved the second LCA for a period from September 12, 2013 to September 12, 2015. SER-14 ¶ 11, 53. Although Varess did not renew his visa upon its expiration in September 2013, when he re-entered the United States on September 3, 2013 after temporarily departing in July 2013, CBP issued him a Form I-94 admitting him for an additional two years until September 2, 2015, telling him he could remain and work in the United States until that date. SER-14 ¶ 12, 55, 67, 101–02.

Varess continued working for Persian in the United States until November 16, 2013, when he traveled to Australia. SER-14 ¶ 13, 59–66 (samples of Varess's work for Persian during this time period), 82, 122–23. Prior to Varess's departure, Shadjareh signed a letter to the United States Consulate in Sydney, Australia in support of Varess's E-3 visa renewal application, stating that Persian desired to continue employing him at a salary of $60,000 per year. SER-56–58, 86–88, 124–25. While Varess initially intended to renew his visa, he ultimately did not, largely due to Persian's failure to pay him. SER-14 ¶ 13, 89, 98–100, 106–07. However, he continued to work for Persian from overseas until July 14, 2014. SER-79, 90, 92, 104–05, 112.

Throughout Varess's employment, Persian completely failed to adhere to the wage attestations in its LCAs. It did not pay Varess a regular salary of either $45,000 or $60,000 per year as required. Rather, it paid Varess irregularly and sporadically in amounts between $300 and $2,300, for a total of only approximately $20,000 during his entire employment. ER-77; SER-23–41 (payment records), 78–81, 90–91.

Varess repeatedly brought up payment issues with Shadjareh and Persian, who would respond that the station was having financial difficulties and promise to pay him at a later date. SER-78–79. Despite these repeated failures, Varess continued to work for Persian. As noted above, Varess had invested considerably in the position, and he also felt compelled to continue working to preserve his professional reputation and to work for a company opposed to the Iranian regime. SER-75–77, 83–85, 96–97. He hoped that Shadjareh would ultimately fulfill his obligations. SER-97.

On July 11, 2014, in response to another inquiry from Varess about his wages, Shadjareh told Varess, via text message, that he could no longer afford to pay him. SER-68–70, 92. Varess, who was understandably deeply hurt and frustrated, did not perform any more

work for Persian after July 14, 2014. SER-68–70, 93, 112. The record
includes no evidence that Shadjareh ever informed Varess that his
employment was terminated, and Varess did not understand
Shadjareh's message to be a notice of termination. SER-95.

### C.   Procedural History

#### 1.   Administrative Proceedings

On February 5, 2015, Varess, through counsel, filed a written
complaint with WHD, alleging that Persian failed to pay him the
required wage. SER-14 ¶ 14, 16–22. That complaint referred to an
earlier telephonic complaint made on December 9, 2014. SER-14 ¶ 14,
16. WHD investigated the complaint and issued a March 28, 2016
determination finding no violations. SER-8–9, 14 ¶ 15. Varess requested
an ALJ hearing to contest WHD's finding. SER-10–11. The ALJ denied
relief to Varess on December 14, 2017, finding that notwithstanding the
LCAs, Varess was not an employee of Persian entitled to a salary. ER-
55–64.

Varess appealed to the ARB, which reversed and remanded on
September 26, 2019, concluding that Persian was required to pay the
wages specified in the LCAs. ER-65–74. In relevant part, the ARB
found that (1) Varess "entered into employment" with Persian; (2)

Persian never effected a *bona fide* termination; and (3) Varess never

entered into voluntary nonproductive status. ER-69–70. Additionally,

noting that Varess's duties included reporting from various locations

and that he frequently produced programs outside the United States,

the ARB concluded that "the mere fact that [Varess] was outside of the

United States [did] not by itself indicate that he was not performing

work for [Persian]." ER-70. It remanded to the ALJ for determinations

on the timeliness of Varess's complaint and on any damages owed. ER-

71–72.

On remand, the ALJ concluded on October 30, 2019 that Varess's

complaint was timely filed and that Persian owed Varess $183,794 in

back wages plus pre- and post-judgment interest. ER-75–78. The ALJ

concluded that neither Varess's failure to renew his visa nor his

departure from the United States vitiated Persian's responsibilities

under the LCAs, that Persian's violations therefore continued until the

end of the second LCA period in September 2015, and that Varess's

February 2015 complaint was therefore timely filed since the applicable

statute of limitations requires complaints to be filed within one year of

the latest alleged violation. ER-75–77. The ALJ found that Varess was

entitled to $84,375 under the first LCA, and $120,000 under the second

LCA, for a total of $204,375. ER-77. The ALJ further found that Persian

paid Varess a total of $20,581, and therefore that Varess was owed

$183,794 ($204,375 minus $20,581), plus interest. *Id.* Persian appealed

to the ARB, and on July 14, 2020, the ARB affirmed the decision on

remand. ER-79–82. The Secretary did not exercise his authority to

perform discretionary review, making the ARB's decision final. Persian

has not, to date, paid the amount it owes Varess under DOL's final

order. SER-130 ¶ 28, 147 ¶ 28.

### 2. District Court Proceedings

On February 11, 2021, Persian initiated this action challenging

the ARB's order under the APA. CR-1. On May 13, 2021, Defendants

answered the complaint and filed a counterclaim for a judgment

enforcing DOL's order and ordering payment to Varess. SER-134–58.

On June 2, 2021, Persian filed its answer to the counterclaim, SER-

127–32, and admitted it had not paid the amount ordered by the ARB.

SER-130 ¶¶ 27–28; *see* SER-147 ¶¶ 27–28. After the administrative

record was filed, the parties filed cross-motions for summary judgment.

CR-29–30; 32–33. On February 7, 2022, after holding a hearing, the

district court issued an opinion and order granting Defendants' motion, denying Persian's, and ordering Persian to pay Varess $183,794, plus prejudgment and post judgment interest. ER-3–21. The district court entered judgment on March 2, 2022. ER-92. This appeal followed.

## V.    STANDARD OF REVIEW

The grant or denial of summary judgment is a conclusion of law which this Court reviews *de novo*, and this Court may affirm on any ground supported by the record, even if not relied upon by the district court. *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1047 (9th Cir. 2009) (citing *Burrell v. McIlroy*, 464 F.3d 853, 855 (9th Cir. 2006)).

Challenges to final agency action decided on summary judgment are likewise reviewed *de novo*, and subject to the standards in section 706 of the APA. *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 732 (9th Cir. 2017). Under this standard, a court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). This is a deferential standard, and a court is not to reweigh the evidence or substitute its judgment for the agency's. *Judulang v. Holder*, 565 U.S.

42, 52-53 (2011); *Tkacz v. Bogden*, No. 18-15771, 788 F. App'x 528, 529

(9th Cir. Dec. 19, 2019). Review under the arbitrary-and-capricious

standard is limited to "whether there has been a clear error of judgment

by the agency and whether the agency action was based on a

consideration of the relevant factors." *Nance v. EPA*, 645 F.2d 701, 705

(9th Cir. 1981). The Court may not "disturb the agency's [factual]

findings … unless the evidence presented would *compel* a reasonable

finder of fact to reach a contrary result." *Family Inc. v. USCIS*, 469 F.3d

1313, 1315 (9th Cir. 2006) (emphasis in original) (internal quotations

and citation omitted). Thus, if this Court concludes that DOL

"considered the relevant factors and articulated a rational connection

between the facts found and the choices made," it must affirm the

district court's grant of summary judgment to Defendants. *Cal.*

*Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir.

2011) (citation omitted).

## VI.  SUMMARY OF THE ARGUMENT

In its opening brief, Persian freely concedes that it failed to

comply with the wage attestations in either of its LCAs. And it further

concedes that the first of its two LCAs was binding and enforceable. It

nonetheless seeks to evade either partial or total responsibility for its failure to pay Varess by advancing two arguments, both of which rely on the same mistaken premise that the expiration of Varess's E-3 visa on September 12, 2013 terminated the "period of authorized employment" during which the wage requirement applied. Persian argues that Varess's visa expiration meant that the second LCA, which was approved for the period from September 12, 2013 to September 12, 2015, was unenforceable. Persian also contends that it need not pay Varess anything—even the wages it concedes it owes him under the first LCA—because Varess filed his administrative complaint with WHD on February 5, 2015, more than one year after his visa expired, which Persian asserts rendered his complaint untimely.

As demonstrated below, the district court correctly concluded that the ARB's rejection of both of these arguments was a reasonable interpretation of the E-3 visa program's labor requirements and was not arbitrary, capricious, contrary to law, or contrary to substantial evidence. Because an E-3 visa merely authorizes travel, not employment, the expiration of Varess's visa in September 2013 did not end Varess's period of authorized employment. Rather, the ARB

reasonably concluded that Varess's LCAs, which, unlike his visa, actually governed the terms and conditions of his employment, defined the period of his authorized employment and the temporal bounds of Persian's wage obligation. While Persian relies heavily on *Manoharan v. HCL America*, a recent ARB decision concerning the period of authorized employment for H-1B nonimmigrants, *Manoharan* is inapposite because there, the ARB concluded that the period of authorized employment for H-1B workers is generally the period for which DHS approves a nonimmigrant worker petition—a document that is not required for E-3 workers. Persian's conflation of a visa and a petition approval—two different documents with different purposes and effects—and its failure to recognize the distinctions between the E-3 and H-1B programs highlight the misplaced nature of its reliance on *Manoharan*.

Rather, because Persian was responsible to pay Varess the required wage for the duration of the second LCA, its violations continued until well *after* he filed his administrative complaint. As such, Persian was responsible to pay Varess his required wages under both the first and second LCAs and Varess's complaint was timely.

Contrary to Persian's claims, this result is fully consistent with the purpose of the E-3 wage requirement, which seeks to protect the jobs of American workers by preventing employers from exploiting vulnerable nonimmigrant workers like Varess and relying on them as a source of cheaper labor.

Finally, the Court should also affirm the district court's grant of summary judgment to Defendants on their counterclaim to enforce the ARB's order. Aside from its arguments advocating reversal of the underlying ARB decision, Persian presents no independent reason why this Court should reverse summary judgment on the counterclaim. The closest it comes is an assertion that enforcement of the order should be denied as inequitable due to its potential effects on Persian—an argument that is unfounded in law, unsupported by any evidence, and not properly before this Court in any event because Persian did not raise it below.

For these reasons, this Court should affirm the district court's decision in its entirety.

# VII. ARGUMENT

## A. This Court Should Affirm the District Court's Summary Judgment Decision on Persian's APA Claim

### 1. Persian Does Not Dispute that it Failed to Pay Varess the Required Wage Under Either LCA or that the First LCA Was Enforceable

It is helpful to begin with what Persian does not dispute. First, Persian expressly admits that it failed to pay Varess the wages specified in either of the two LCAs. *See* AOB at 12 (stating that Persian paid Varess a total of only approximately $20,000 during the course of his employment). Nor can Persian dispute this. The INA required Persian to pay Varess the greater of the prevailing or actual wage, *see* 8 U.S.C. § 1182(t)(1)(A)(i), and under the regulations, if there are no other employees with substantially similar experience and qualifications in the specific employment in question, the actual wage is simply the nonimmigrant worker's wage. 20 C.F.R. § 655.731(a)(1). Varess fell into this category, as his qualifications and duties at Persian were unique. *See* SER-58 (describing Varess as "uniquely qualified" for his position), 95 (noting that Persian never had a sports program before Varess worked there), 120 (same). Thus, because the first LCA listed a prevailing wage of $44,013 per year and an actual salary of $45,000,

SER-45, the actual wage, and the required wage, was $45,000.

Likewise, because the second LCA listed a prevailing wage of $59,384 and an actual salary of $60,000, SER-51, the required wage under the second LCA was $60,000. And undisputed evidence supports the ALJ and ARB's findings that Persian failed to pay these promised salaries. *See* SER-23–41 (evidence submitted by Persian—a combination of check copies, tax forms, and an internal report—purporting to show payments totaling only $21,473); ER-77 (ALJ's discussion of evidence); *id.* (ALJ's acceptance of admission by Varess's attorney that Varess was paid $20,581); SER-78–81, 90–91 (Varess's uncontroverted testimony that he was never paid regularly).

Second, Persian agrees that the first LCA was enforceable, and therefore that its failure to pay the wage specified in that LCA rendered it legally liable. *See* AOB at 24 ("Appellant admits that it owes Varess for back wages earned under the first LCA …."). Nor can it dispute this; the record shows that Persian signed the first LCA, that DOL certified it, and that Varess entered the United States in E-3 status and "enter[ed] into employment" with Persian beginning in November 2011,

and therefore that it became subject to the requirement to pay Varess

the actual wage specified in the LCA. 20 C.F.R. § 655.731(c)(6).

### 2. The District Court Appropriately Declined to Disturb the ARB's Reasonable Conclusion that the Expiration of Varess's E-3 Visa Did Not End Persian's Requirement to Pay the Required Wage

Persian's appeal in this Court boils down to a single argument:

that the expiration of Varess's E-3 visa on September 12, 2013 ended

the "period of authorized employment" during which the INA's wage

requirement applied. Persian, however, is mistaken. While Persian is

correct that an employer is only obligated to pay E-3 workers the

required wage during the "period of authorized employment," 8 U.S.C. §

1182(t)(1)(A)(i), a visa is a travel document and does not authorize

employment. Rather, the ARB reasonably concluded that Varess, whose

LCA and authorized stay in the United States both extended until

September 2015, remained in a "period of authorized employment" for

purposes of the wage obligation until the Second LCA expired.

### a. A Visa is a Travel Document, While an LCA is an Employment Document

Persian's contention that Varess's "period of authorized

employment" was limited to the validity period of his visa

misunderstands the purpose and effect of a visa. A visa is a travel

document that authorizes a foreign national, during a designated period, to travel to the United States and to apply for admission. *See* State Dep't FAM, 9 FAM 102.1 ("Having a U.S. government-issued visa allows the visa holder to travel to a U.S. port of entry, airport, or land border crossing, and request permission of the Department of Homeland Security (DHS), Customs and Border Protection (CBP) inspector to enter the United States.").[5] It does not confer employment authorization or define employment rights, nor does it set the amount of time an E-3 worker may stay and work in the United States. *See* 22 C.F.R. § 41.112(a) ("The period of validity of a nonimmigrant visa is the period during which the alien may use it in making application for admission. The period of visa validity has no relation to the period of time the immigration authorities at a port of entry may authorize the alien to stay in the United States.").

In contrast, the LCA speaks directly to the employment of an E-3 worker. It is the only document that the INA requires of an E-3 employer who hires an E-3 worker (in contrast with H-1B workers, who also must file petitions, *see infra* Part VII.A.2.d). It sets out numerous

---

[5] https://fam.state.gov/FAM/09FAM/09FAM010201.html.

details regarding the position(s) in which the employer seeks to employ one or more nonimmigrant workers, including the required wages, and contains numerous attestations with which the employer must comply for the duration of the worker's employment. *See* 20 C.F.R. § 655.730(c)(4), (d); SER-42–53 (copies of Persian's LCAs). It was therefore eminently reasonable for the ARB to conclude that the LCAs, and not the visa, controlled the length of Persian's wage obligation to Varess. *Accord* 20 C.F.R. § 655.750(a) (explaining that "[t]he period of authorized employment . . . is based on the first date of employment and ends … [i]n the case of an E-3 … LCA, on the latest date indicated or two years after the employment start date under the LCA, whichever comes first").

### b. Varess Received Authorization to Stay in the United States Until September 2015

To the extent that a document other than the LCA was relevant to the determination of Varess's "period of authorized employment," it was Varess's most recent Form I-94 that CBP issued him in September 2013, which authorized him to remain in the United States for an additional two years until September 2015. *See* SER-55, 67. While Persian contends that CBP's admission of Varess until September 2015

was erroneous, it fails to provide authority for that contention or explain why any alleged error by CBP would deprive the I-94 of legal force or Varess of his legal status. *See* AOB at 26. CPB guidance states that "[t]he 'Admit Until Date' [on the I-94] is the date that the traveler's immigration status expires in the U.S." U.S. Customs & Border Protection, I-94 Expiration Dates (July 2015).[6] And State Department regulations and guidance are similarly clear that the expiration of a visa prior to the expiration date of an I-94 does not affect a noncitizen's ability to remain in the United States. *See* 22 C.F.R. § 41.112(a) ("The period of visa validity has no relation to the period of time the immigration authorities at a port of entry may authorize the alien to stay in the United States."); U.S. Dep't of State, Bureau of Consular Affairs, About Visas – The Basics (explaining to noncitizens that CPB "will note your authorized period of stay on your admission stamp or paper Form I-94," and that "[y]ou will be able to remain in the United States during your authorized period of stay, even if your visa expires

_____

[6] https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/502386%20-%20I-94%20Fact%20Sheet_OFO.pdf.

during the time you are in the United States").[7] Thus, even assuming that Varess should not have been admitted for two additional years in September 2013—though Persian has not shown this to be the case—he was, and Persian has not shown that any alleged error deprived Varess of his E-3 status in the United States or affected his "period of authorized employment" for purposes of Persian's wage obligation.

### c. Persian's Position is Inconsistent with the Breadth of the LCA Wage Requirement and the Limited Exceptions to that Requirement

Persian's contention that Varess's visa expiration should terminate its wage obligation is also inconsistent with the INA's general requirement that employers pay E-3 workers for the duration of the employment relationship unless certain narrowly defined exceptions are met. An E-3 worker must receive the required wage "beginning on the date when the nonimmigrant 'enters into employment' with the employer." 20 C.F.R. § 655.731(c)(6); *see* 8 U.S.C. §§ 1182(t)(1)(A), 1182(t)(3)(C)(vii)(I)–(III). From that point on, the LCA binds the employer to pay the required wages for the duration of the "period of

---

[7] https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/frequently-asked-questions/about-basics.html.

authorized employment" except in very limited circumstances. *See* 20 C.F.R. § 655.731(a)(2)(viii) ("The LCA is valid for the period certified by [DOL], and the employer must satisfy all the LCA's requirements (including the required wage which encompasses both prevailing and actual wage rates) *for as long as any [E-3] nonimmigrants are employed pursuant to that LCA*[.]") (emphasis added). Indeed, the employer must pay the required wage even if the LCA is withdrawn, suspended, or invalidated, as long as the employer continues to employ the worker. *Id.* § 655.750(b)(3), (c)(3).

The statute and regulations list only two circumstances in which employers need not pay the required wage. One is if there is a *bona fide* termination of the employment relationship, which permits the employer to "stop paying the employee altogether." *Dedios v. Med. Dynamic Sys., Inc.*, No. 16-072, 2018 WL 2927675, at *1 (ARB Mar. 30, 2018); *see* 20 C.F.R. § 655.731(c)(7)(ii). This requires, at the bare minimum, a notice of termination sufficient to create a "meeting of the minds between the employer and the nonimmigrant that the employment relationship [was] terminated." *Gupta v. Jain Software Consulting, Inc.*, No. 05-008, 2007 WL 1031365, at *4 n.3 (ARB Mar. 30,

2007); *see Administrator v. ME Global, Inc.*, No. 2016-0087, 2019 WL
3293915, at *12 (ARB Mar. 22, 2019) (*bona fide* termination requires
employer to give notice of termination to the worker). *See also*
*Administrator v. S V Techs., LLC*, No. 12-042, 2013 WL 6979699, at *5
(ARB Dec. 23, 2013) (applying requirement to effect a *bona fide*
termination to employer of E-3 workers). The other circumstance in
which an employer is excused from paying the required wage is if the
employee is in nonproductive status due to "conditions unrelated to
employment which take the nonimmigrant away from his/her duties at
his/her voluntary request and convenience (e.g., touring the U.S., caring
for ill relative) or render the nonimmigrant unable to work (e.g.,
maternity leave, automobile accident which temporarily incapacitates
the nonimmigrant)." 20 C.F.R. § 655.731(c)(7)(ii); *see* 8 U.S.C. §
1182(t)(3)(C)(vii)(IV). If an employee is in nonproductive status for "any
other reason," the employer must pay the required wage. 20 C.F.R. §
655.731(c)(7)(i).

As the ARB and district court both concluded, neither of these
conditions was met here. Persian never effected a termination of
Varess's employment because it never informed him that it was

terminating him. ER-16–17; *see* SER-95. As such, there was no *bona fide* termination before the LCAs expired. And neither the expiration of Varess's visa nor his departure from the United States was a non-work-related factor that rendered him nonproductive or unable to work. In fact, as the ARB and district court recognized, Varess's duties expressly included live reporting from sporting events, and the record showed that he could and did work for Persian from abroad on numerous occasions, including reporting from Ireland, Belgium, France, and Australia, both before and after he left the United States for the final time in November 2013. ER-16, 70.

Persian has conceded both of these points, and no longer contends that Varess's visa expiration or departure from the United States satisfied either of these two exceptions to the wage requirement. *See* ER-69 (ARB noting that Persian conceded that it never effected a bona fide termination); ER-81 (same); AOB at 27 (Persian "does not dispute" that Varess could have remained in E-3 employment for Persian—"even if he worked from Australia"—had he renewed his visa).[8]

---

[8] Persian has therefore waived or forfeited any arguments that it was excused from paying Varess the required wage on these grounds.

Given the breadth of the wage requirement and the two limited,

carefully crafted exceptions to that requirement, the district court

correctly concluded that Persian's position that an expired visa ends the

wage obligation is tantamount to a request for an additional, unwritten

exception. As the district court correctly concluded, such a position is

contrary to basic canons of construction. *See* ER-18 ("[W]hen a provision

contains express exceptions, 'the familiar judicial maxim *expressio*

*unius est exclusio alterius* counsels against finding additional, implied,

exceptions[.]'") (quoting *Syed v. M-1, LLC*, 853 F.3d 492, 501 (9th Cir.

2017)). Rather, the district court correctly affirmed the ARB's

reasonable conclusion that these events did not end Persian's wage

obligation to Varess.

### d. The ARB's Decision in *Manoharan* Is Distinguishable Because It Involved an H-1B Worker, not an E-3 Worker

Persian's heavy reliance on the ARB's recent decision in

*Manoharan v. HCL America*, No. 2021-0060, 2022 WL 1469017 (ARB

Apr. 14, 2022), is misplaced. In *Manoharan*, the ARB considered the

---

*See Martinez–Serrano v. INS*, 94 F.3d 1256, 1259–60 (9th Cir. 1996)
(arguments not raised in appellant's opening brief are deemed waived).

"period of authorized employment" for H-1B nonimmigrant workers, and concluded that in most cases, this period ends on the expiration date of the worker's H-1B petition approval notice. 2022 WL 1469017, at *9. The ARB therefore rejected an H-1B worker's contention that his employer's wage obligation lasted until the later date set out in his LCA. *Id.* In doing so, however, the ARB explicitly limited its legal analysis to the H-1B program. *See id.* at *5 n.49 ("This analysis applies only to the H-1B program and not to similar programs like H-1B1 and E-3.").

There was good reason for the ARB to limit its analysis: while the E-3 and H-1B1 nonimmigrant visa programs are similar to H-1B in many respects, including the requirement to pay the greater of the prevailing or actual wage during the "period of authorized employment," they differ from H-1B in one critical one: an H-1B worker must have an approved nonimmigrant worker petition from USCIS in order to be employed, whereas no petition is required to permit the employment of E-3 or H-1B1 workers.[9] Rather, the INA authorizes E-3

---

[9] In two exceptions not relevant here, an H-1B worker may continue to work without a currently valid approved petition. The "H-1B

and H-1B workers to be employed in the United States with only an LCA and a visa. *See* 20 C.F.R. §§ 655.700(d)(1); 72 Fed. Reg. at 1651; 70 Fed. Reg. at 52,292; *see also* 8 U.S.C. § 1184(c)(1); 8 C.F.R. § 274a.12(b)(25); 20 C.F.R. § 655.705(b).[10] Accordingly, while the ARB correctly determined in *Manoharan*, based on the applicable statutory and regulatory provisions, that for purposes of *H-1B* employment, the USCIS petition approval is the document that places a worker in a "period of authorized employment," such a determination is facially

---

portability" statutory and regulatory provisions allow a worker already in H-1B status to accept new employment if the new employer files a petition for the worker before the worker's previously authorized period of stay expired. Additionally, an H-1B worker whose work authorization has expired may continue their employment for up to 240 days if their employer has timely filed a petition to extend the worker's stay. *Manoharan*, 2022 WL 1469017, at *8 & nn. 79–81 (citing 8 U.S.C. § 1184(n); 8 C.F.R. § 214.2(h)(2)(i)(H); 8 U.S.C. § 1184(n)(1); 8 C.F.R. § 274a.12(b)(20)).

[10] The E-3 and H-1B1 nonimmigrant worker programs were established as a result of treaties between the United States and specific nations—Australia for E-3; Chile and Singapore for H-1B1. *See* REAL ID Act of 2005, Pub. L. No. 109-13, § 501, 119 Stat. 231; United States-Singapore Free Trade Agreement Implementation Act, Pub. L. No. 108-78, § 402, 117 Stat. 948 (2003); United States-Chile Free Trade Agreement Implementation Act, Pub. L. No. 108-77, §§ 402-404, 117 Stat. 909 (2003). As such, nonimmigrant workers in specialty occupations from those nations enjoy a more streamlined path to temporary employment in the United States.

inapplicable to an *E-3* worker like Varess, for whom no petition existed or was required.

Persian's misplaced reliance on *Manoharan* is underscored by two errors in its characterization of the decision and the applicable regulations. First, Persian conflates the term of the H-1B *petition approval* – which the ARB in *Manoharan* recognized defines the "period of authorized employment" for H-1B workers—with the term of a *visa*. *See* AOB at 23 (asserting that "the expiration of an H-1B (or by association E-3) *visa* constituted the end of the 'period of authorized employment'") (emphasis added), 25 (claiming that "[t]he ARB in *Manoharan* found that any period of authorized employment expires with the expiration of a valid *visa* or any USCIS extension thereof") (emphasis added). Second, Persian erroneously claims that "the regulations for the filing of the LCA and employer's obligations thereunder are the same for H-1B, H-1[B]1 and E-3 visas." *Id.* at 21. In fact, while the regulations and requirements are largely the same, they contain explicit carve-outs for provisions that apply only to H-1B workers and not to E-3 and H-1B1 workers, including all "references to a petition process before USCIS." 20 C.F.R. § 655.700(d)(1). Statutory

provisions and DHS regulations similarly exclude E-3 workers from references to a petition. *See* 8 U.S.C. § 1184(c)(1) (describing petition requirement for nonimmigrants "under subparagraph (H), (L), (O), or (P)(i) of section 1101(a)(15) of [Title 8 of the U.S. Code]), (excluding nonimmigrants under section 1101(a)(15)(H)(i)(b1) of [Title 8]" whereas E-3 status stems from 8 U.S.C. § 1101(a)(15)(E)(iii)); 8 C.F.R. § 214.1(*l*)(1) (expressly distinguishing between "the validity period of the petition" for H-1B (and L-1) workers and "a validity period otherwise authorized for the E-1, E-2, E-3, and TN classifications"). This further demonstrates that *Manoharan*, which links the period of authorized employment to petition approval for H-1B workers, simply cannot be applied directly to E-3 or H-1B1 workers.

As no petition or petition approval for Varess, an E-3 worker, existed or was required, the ARB reasonably concluded in this case that given that Varess was already employed by Persian, given that he was able to and did continue to work for Persian after his visa expired, given that he was never in nonproductive status for non-work-related reasons, and given that Persian failed to effect a *bona fide* termination, Persian remained liable for its wage obligation to him until the expiration of its

most recent LCA—the only required document for an E-3 worker that actually pertains to employment. Likewise, the ARB reasonably concluded that since Varess could and did perform his duties abroad, Persian remained responsible for its wage obligation to him under its LCA even after he left the United States.[11] The district court therefore correctly concluded that the ARB's conclusion that Persian remained bound by its wage obligation to Varess for the duration of both LCAs despite his visa's expiration and travel abroad was not arbitrary, capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence.

---

[11] The ARB's decision does not mean that an LCA can bind an employer to a wage obligation even if the worker never enters the United States. The wage requirement only applies after the nonimmigrant "enters into employment," 20 C.F.R. § 655.731(c)(6), and the ARB concluded that a nonimmigrant must enter the United States to satisfy this condition. *See* ER-69 (explaining that Varess "entered into employment" when he entered the United States in November 2011 and September 2013 and began working for Persian under the first and second LCAs, respectively). Here, Varess's employment relationship with Persian began when he entered the United States in 2011, and even assuming that the second LCA required its own "ent[ry] into employment" to become enforceable, that occurred on September 12, 2013 when the second LCA period began while Varess was already working for Persian in the United States.

### e. Persian Was Responsible to Pay Varess the Required Wage for the Duration of the Second LCA, and Varess's Administrative Complaint Was Therefore Timely

Because, as demonstrated above, Varess's visa expiration in September 2013 did not end the period of authorized employment, and because, as Persian concedes, it never effected a *bona fide* termination and Varess never became voluntarily nonproductive or unable to work for non-work-related reasons, the second LCA—which was signed by Persian and certified by DOL—took effect on September 12, 2013 and remained valid and enforceable throughout its two-year term. This meant that, as the ARB concluded, Persian continued to violate the wage requirement for the duration of the Second LCA until September 2015, and as a result, Varess's administrative complaint in February 2015 was timely.

An aggrieved party alleging a violation of an LCA must file an administrative complaint "not later than 12 months after the latest date on which the alleged violation(s) were committed," which is "the date on which the employer allegedly failed to perform an action or fulfill a condition specified in the LCA[.]" 20 C.F.R. § 655.806(a)(5). This time bar, however, "does not affect the scope of the remedies which may be

assessed by the Administrator. Where, for example, a complaint is timely filed, back wages may be assessed for a period prior to one year before the filing of a complaint." *Id.*

"[T]he limitations period begins to run when the violation occurred," which in the case of a wage violation is when an employer fails to pay the required wage when due. *Jain v. Empower IT, Inc. d/b/a Infobahn Techs.*, No. 08-077, 2009 WL 3614509, at *6 (ARB Oct. 30, 2009). An employer's consistent and continual failure to pay the required wage, including failing to pay for nonproductive time, is a continuing violation. *ME Global, Inc.*, 2019 WL 3293915, at *7. Accordingly, where, as here, an employer continues to fail to pay an employee the required wage and does not effect a *bona fide* termination and the worker does not become voluntarily nonproductive or unable to work for non-work-related reasons, the violation is "actionable for the duration of the employment relationship as stipulated in the LCA," since the violation continues as long as the employer is required to pay the employee and fails to do so. *Id.*

As set out above, both of Persian's LCAs required it to pay Varess the required wage. Persian's failure to do so was consistent and

continuing, and persisted for the duration of the employment relationship, which, because Persian never effected a *bona fide* termination, persisted until the end of the second LCA period on September 12, 2015. As such, the limitations period had not even begun to run when Varess filed his written complaint in February 2015, and Varess's timely complaint on that date permitted him to seek back wages for the entire duration of his employment.

Persian's argument that Varess's complaint was untimely is premised on the assumption that its wage obligations to Varess—and any violations—terminated in September 2013, when his visa expired, and therefore that his complaint in February 2015 was more than 12 months after Persian's latest violation. However, as explained at length above, the ARB reasonably concluded that Persian's wage obligations did not terminate upon Varess's non-renewal of his visa. The district court and ARB therefore correctly rejected Persian's statute-of-limitations argument.

### 3. The District Court's Decision Is Consistent with the Policy of the E-3 Statute and Regulations

While Persian argues, AOB at 28–29, that the outcome in this case is contrary to the purpose of the LCA wage requirements, the

opposite is true. By entitling nonimmigrant workers to a required wage, these provisions protect American workers by preventing employers from relying on foreign workers who otherwise might accept lower pay. *See Kolbusz-Kijne v. Tech. Career Inst.*, No. 93-LCA-0004, 1994 WL 897284, at *7 (DOL Ofc. of Admin. Appeals July 18, 1994) (LCA requirements "protect the wages and working conditions of [nonimmigrant] workers, and thereby, also protect the wages and working conditions of U.S. workers similarly employed"). These strict requirements, including payment for nonproductive time, seek to ensure that employers do not exploit foreign workers and, as a result, do not rely on them as a source of cheaper labor.

Even more so than in a regular employment relationship, there is a significant power imbalance between employers and nonimmigrant workers, many of whom—like Varess—have sacrificed greatly for the opportunity to work in the United States and are not in a position to simply quit their jobs and easily return to the *status quo ante*. Persian took advantage of this situation and of Varess's dedication to his job, continuing to string him along with sporadic payments and hollow promises. While Varess's situation may have been unusual in that his

visa expired and he left the United States while continuing to work under his LCA, Persian's treatment of Varess was precisely the type that the LCA requirements were enacted to prevent: it hired a foreign worker, used his vulnerabilities to extract unpaid and underpaid work, and finally refused to pay him at all.

Moreover, the existing regulatory framework is more than adequate to handle scenarios where it would be inappropriate to hold an employer to its LCA attestations. Where a nonimmigrant worker leaves the United States voluntarily and is unable to perform the job as a result, the employer need not pay the required wage. *See* 20 C.F.R. § 655.731(c)(7)(ii); *ME Global, Inc.*, 2019 WL 3293915, at *7 (employer was not required to pay metallurgical engineer for time during which he was unavailable to work after he returned to Canada). The employer may also easily and unilaterally relieve itself of its wage liability via a *bona fide* termination of the employment relationship. *See* 20 C.F.R. § 655.731(c)(7)(ii). Here, Persian's responsibility for the required wage for the entire second LCA period is not due to any error by the ARB or district court, but rather to Persian's choice to ignore the *bona fide*

termination option, just as it ignored its obligation to pay Varess the required wage in the first place.

## B. The Court Should Affirm the District Court's Grant of Summary Judgment on DOL's Counterclaim

Based on the foregoing, this Court should affirm the district court's grant of summary judgment to DOL to enforce Persian's obligation to pay Varess's back wages. Indeed, Persian does not appear to contest the merits of DOL's counterclaim on appeal, and similarly declined to do so before the district court. *See* SER-5–6 (Persian's response to Defendants' summary judgment motion). Rather, Persian appears to raise an argument that a judgment on the counterclaim would be inequitable, asserting that the award would force it to close and render its workers unemployed. AOB at 28–29. Persian provides no authority that such an argument is a viable defense against enforcement of an agency order, nor does it cite any evidence in support of its factual assertions. Additionally, any challenge to the enforcement counterclaim on this or any other basis is not properly before the Court since Persian did not raise any such challenge below. *See* SER-5–6. *See also Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("As a general rule, we will not consider arguments that are raised for the first time on

appeal."). Finally, as discussed above, contrary to Persian's assertions, the result here is fully consistent with the policies underlying the E-3 program and its wage requirement. *See supra* Part VII.A.3. Accordingly, unless this Court vacates or modifies the ARB's order, it should affirm the district court's grant of summary judgment on the enforcement counterclaim as well.

## VIII. CONCLUSION

For the foregoing reasons, Defendants-Appellees respectfully request that this Court affirm the district court's judgment in their favor.

Dated: November 14, 2022      Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

*/s/ Matthew J. Smock*
MATTHEW J. SMOCK
Assistant United States Attorney

Attorneys for Defendants-Appellees
Martin J. Walsh, Secretary of Labor,
and U.S. Department of Labor

**STATEMENT OF RELATED CASES**

Counsel for Appellees is not aware of any related cases pending in this Court.

Dated: November 14, 2022      Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

 */s/ Matthew J. Smock*
MATTHEW J. SMOCK
Assistant United States Attorney

Attorneys for Defendants-Appellees
Martin J. Walsh, Secretary of Labor,
and U.S. Department of Labor

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-55254

I am the attorney or self-represented party.

**This brief contains** | 8,545 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
  - ○ it is a joint brief submitted by separately represented parties;
  - ○ a party or parties are filing a single brief in response to multiple briefs; or
  - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated [          ].
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Matthew J. Smock     **Date** | Nov 14, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 08**                                              *Rev. 12/01/2018*